```
1                    IN THE UNITED STATES DISTRICT COURT
                    FOR THE SOUTHERN DISTRICT OF TEXAS
2                            HOUSTON DIVISION

3   UNITED STATES OF AMERICA        )      NO. 4:14-CR-204
                                    )
4                                   )
    VS.                             )        Houston, Texas
5                                   )        11:38 a.m.
                                    )
6   LEONARD KIBERT,                 )      February 11, 2016
    TSOLAK GEVORGYAN,               )
7   CHRISTOPHER O'BRIEN AND         )
    AND GREGORIUS BROWN             )
8

9

10      ********************************************************

11                             HEARING

12          BEFORE THE HONORABLE KEITH P. ELLISON

13              UNITED STATES DISTRICT JUDGE

14
        ********************************************************
15  APPEARANCES:

16  FOR THE UNITED STATES OF AMERICA:

17       Mr. Albert A. Balboni
         Mr. Rodolfo Ramirez
18       United States Attorneys Office
         1000 Louisiana, Suite 2300
19       Houston, TX 77002
         Tel:  713-567-9726
20
    FOR THE DEFENDANT LEONARD KIBERT:
21
         Ms. Daphne L. Silverman
22       Silverman Law Group
         501 North IH 35
23       Austin, TX 78702
         Tel:  512-485-3003
24

25
```

```
 1  FOR THE DEFENDANT TSOLAK GEVORGYAN:

 2       Mr. Patrick F. McCann
         Attorney at Law
 3       909 Texas Ave, Suite 205
         Houston, Texas 77002
 4       Tel:  713-223-3805
          (Appearing via telephone)
 5
    FOR THE DEFENDANT CHRISTOPHER O'BRIEN:
 6
         Mr. Thomas S. Berg
 7       Attorney at Law
         4306 Yoakum Blvd.
 8       Suite 400
         Houston, Texas 77006
 9       Tel:  713-236-1900

10  FOR THE DEFENDANT GREGORIUS BROWN:

11       Mr. David Adler
         David Adler PC
12       6750 W Loop S
         Suite 120
13       Bellaire, Texas 77401
         Tel:  713-666-7576
14
    COURT REPORTER:
15
         Ms. Kathleen Miller, CSR, RMR, CRR
16       515 Rusk, Room 8004
         Houston, Texas  77002
17       Tel:  713-250-5087

18  Proceedings recorded by mechanical stenography.

19  Transcript produced by computer-assisted transcription.

20

21

22

23

24

25
```

1              THE COURT:  All right.  Good morning, and

2  welcome.  All right.  I'm sorry.  We are ready.  United

3  States versus Kibert and others.  We'll take appearance of

4  counsel, beginning with the Government.

5              MR. BALBONI:  Al Balboni and Rudy Ramirez for

6  the United States.  Good morning, Your Honor.

7              THE COURT:  Welcome.  Yes, good morning.

8              MR. RAMIREZ:  Good morning, Your Honor.

9              MS. SILVERMAN:  Daphne Silverman for

10  Dr. Kibert.

11              MR. BERG:  Tom Berg for Christopher O'Brien.

12              MR. ADLER:  David Adler for Greg Brown, who is

13  present in the courtroom, Your Honor.

14              THE COURT:  Is no one else here?  Mr. Cogdell

15  not coming?

16              MR. MCCANN:  Pat McCann on telephone, Your

17  Honor, for Mr. Gevorgvan.

18              THE COURT:  Anybody else on the phone?

19              MR. MCCANN:  Not as far as I know, sir.  I'm

20  the only one.

21              THE COURT:  Okay.  We have a Motion to Compel

22  Production of Witness Information, Superseding Motion in

23  Limine on the spreadsheet.  Have you made any progress

24  toward resolving these?

25              MR. BALBONI:  As far as production, Your Honor,

1 of witness information, that has been produced to the
2 Defense, so I believe that motion is moot at this point.
3           MS. SILVERMAN:  I think that's true.  I think
4 you actually may find an order mooting that motion to
5 compel production.  We do have some other motions on
6 discovery pending related to, but not the witness
7 information.  The witness information was provided.
8           THE COURT:  Maybe I didn't notice them all.
9 Tell me what else is on the menu.
10          MS. SILVERMAN:  There is the motion for -- Pat
11 can't hear me if I'm standing here.
12          THE COURT:  Yeah.  It's probably better if
13 everybody speaks from that microphone, because otherwise in
14 general, won't be able to hear.
15          MS. SILVERMAN:  So there's the Defendant's
16 Motion For Discovery Inspection that was originally filed
17 by Dan Cogdell, that we refiled again, and then there's the
18 Supplemental Motion for Discovery and Brady Material, which
19 really just provides more information about what we need.
20 And no, we've not been able to reach an agreement on this
21 right now.  I think we may, with the help of Novitas, be
22 close to an agreement on the issue of the claims forms
23 themselves being produced.  That was the Number 1 thing.
24          It was in actually Mr. Cogdell's original
25 motion, my motion, and in various other efforts to try to

1  get our hands on the claim forms themselves so that we can

2  actually see the data we need to prepare for trial.

3                    The company that has --

4            THE COURT:  These are things that normally work

5  out between counsel.  I mean, I think the Government's

6  position is they have provided this.

7            MS. SILVERMAN:  And that has been their

8  position, and they have not.  And so I have provided in my

9  last pleading last night regarding discovery a copy of the

10 e-mail from Novitas indicating they haven't provided the

11 originals in a tab.

12           THE COURT:  The e-mail wasn't attached to my

13 copy, at least, so...

14           MS. SILVERMAN:  Okay.  It's an e-mail exchange

15 with the lawyer from Novitas in which she states that she

16 can provide the original data.  The document that the

17 Government provided is not the original data.  She can

18 provide it, but she's saying she needs approximately two

19 weeks, which continues to be a conflict because our court

20 date is coming up.  And I'm hopeful that the Government can

21 encourage her to be able to accomplish that in a quicker

22 manner.

23           THE COURT:  Okay.  Let me hear from the

24 Government on that point, at least.

25           MR. BALBONI:  Yes, Your Honor.  What

1  Ms. Silverman is requesting is -- and I've addressed this
2  in a couple of responses -- is what she terms "original
3  claims data."  The testimony from the people responsible
4  for, if you will, maintaining and producing that data is
5  that what is originally received when a claim comes in, is
6  captured by the Medicare system, if you will, and that data
7  remains the same whether it's sitting on the system that
8  is, for lack of a better term, live; that is, it can be
9  accessed directly; or whether after a certain time period,
10 it's archived.
11         THE COURT:  Okay.  I'm going to have a hard
12 time deciding this as a matter of a disputed fact.
13              Have you had a conversation with
14 Ms. Silverman?
15         MR. BALBONI:  I believe we've talked about
16 this, Your Honor, but we're at, I guess, an impasse in the
17 sense that Ms. Silverman is of the opinion that a certain
18 category of data exists, in her words, in the "original
19 form" that is not in the Medicare database at this point;
20 therefore, it has somehow been destroyed, lost, or
21 whatever.  It is the position of Medicare and the
22 Government that there is no such thing, that everything
23 that was on the original claim --
24         THE COURT:  Mr. McCann.
25         MR. MCCANN:  I'm sorry, sir?

1            THE COURT:  Can you put your phone on mute
2   until you're ready to speak?
3            MR. MCCANN:  Yes, sir, I think I can.
4            MR. BALBONI:  What Ms. Silverman is looking for
5   is the record, if you will, electronic record, of which
6   human being physically keyed in the allegedly false
7   billings.  And our response back, based on information from
8   CMS, the contractors, is that there never is transmitted to
9   Medicare the name of the individual who physically keyed in
10  the data, the claim.  The only thing transmitted in respect
11  to identification is the submitter ID, which is assigned to
12  the particular doctor, in this case, Dr. Kibert.  And
13  anybody that Dr. Kibert gives permission to use that
14  submitter ID can file the claims, but there is no separate
15  field, if you will, of data that indicates that Mary Smith
16  was the individual who physically keyed in that false
17  claim.  And that's the impasse we're having.  Ms. Silverman
18  is looking for something that doesn't exist.
19           THE COURT:  I don't know how can I can resolve
20  that?  How am I supposed to resolve it?  Bring somebody
21  from the company to testify?
22           MR. BALBONI:  If necessary, Yes, Your Honor.
23           MS. SILVERMAN:  May I respond, Judge?
24           THE COURT:  Yes, you may.  Come to the
25  microphone.

1              MS. SILVERMAN:  Yes, sir.

2                   So a couple of things.  That was one thing

3 we were looking for, and that was an example that I was

4 given as one of the most important things.  There is some

5 other things that are not in the spreadsheet which also, by

6 the way, has the problem that it is unmanageable.  There

7 are, I think, 30 or 50 fields that you have to scroll

8 through to find the data, so the experts --

9              THE COURT:  Well, the Government can't do that,

10 can't help you with that, really.

11             MS. SILVERMAN:  Actually, they can.  If it's in

12 the claim form, we can read it.

13                  And so -- but what I'm saying also is that

14 the provider, Novitas, is now telling me she can provide

15 what I'm talking about.  She can provide it.  When I look

16 at their website, I can see that their website indicates

17 that for a year after the claim is adjusted, the portal is

18 still open, which is their technology terminology.  You can

19 access it yourself.  The doctor, the provider, would be

20 able to see it.  We're after that time period.  She is

21 saying that what's on her website, it tells me I should be

22 able to see, she can get for me.  She is just now --

23             THE COURT:  Why doesn't she, then?  Why doesn't

24 she?

25             MS. SILVERMAN:  She's now telling me it's going

1  to take two weeks.  Now why she didn't start doing that

2  when she first got her subpoena or why she didn't do it

3  when the Government requested it, I don't know.

4          THE COURT:  What are you asking me, a

5  continuance or --

6          MS. SILVERMAN:  If the Government could speed

7  her up.  And I think that if they would put their -- they

8  produced for him a large document.  I think that if he

9  could tell her to speed up, she could have it by next week,

10  and we could be ready.  And I told her I don't need --

11          THE COURT:  I don't know the nature of the

12  Government's relationship with this woman.  I really don't.

13          Mr. Balboni?

14          MR. BALBONI:  Yes, Your Honor, maybe I can --

15  hopefully, I can explain.

16          The document, if you will, that

17  Ms. Silverman is seeking the original claim form, we, the

18  Government, way back, so far back that I forgot we even had

19  them, because of a matter in a different case, we began

20  asking Novitas, which is the contractor, to provide us some

21  of these claims.  So we had about 112 or so of these

22  claims.

23          When I realized what it was that

24  Ms. Silverman was asking for, I actually provided to her a

25  sample of the claims of that 107 or 112 claims that we had.

1  Those same sample I provided to the Court in my
2  supplemental response to the Motion in Limine so that the
3  Court can take a look at this document that Ms. Silverman
4  is so anxious to obtain and confirm what I said earlier,
5  and that is that nowhere on the face of this document is an
6  indication of which human physically keyed in the claim.
7                     As far as turning -- as far as lighting a
8  fire, if you will, under Novitas, the problem, Your Honor,
9  is that almost all of the data is, at this point, archived,
10 which means that the first thing that has to happen is they
11 have to reload -- going all the way back to 2007, reload
12 all of that data onto the active system, if you will.  Once
13 they do that, then, because apparently they have technology
14 from the dark ages, the only way they can produce these
15 electronic claims is they have to go one by one, literally
16 pull up the claim, pull up the data, take a screen shot of
17 it, print it, then bring up the next one, do the same thing
18 again.  I have been told it would take at least two weeks
19 to load the data.
20                     THE COURT:  Are you talking to the same person
21 she's talking to?
22                     MR. BALBONI:  She's talking to the lawyer
23 representing Novitas.  I talked with that lawyer, but
24 before that, I'm talking with the folks at Novitas who
25 would be -- through my agents, talking to them -- will be

1  the people charged with the actual task of producing all of

2  this.

3          And like I said, what I provided to the

4  Court, just because by happenstance we already had it, is

5  examples of what it is that Ms. Silverman is looking for.

6  So perhaps that would be a way to resolve this, short of

7  having to bring in -- or having to put Novitas through

8  the burden of pulling all of that data back onto the system

9  and then physically printing each claim as a screen shot.

10          THE COURT:  Ms. Silverman?

11          MS. SILVERMAN:  Unfortunately, none of the

12  examples were any of the patients that the Government is

13  offering, and so we -- in addition -- and I hate to have to

14  disclose so much of the defense case, but my expert is

15  looking for other data that's in there, some of which is on

16  the forms that he provided, but for none of the patients he

17  plans on using.  So even if we had the documents that he

18  provided but for the patients he's using, my expert would

19  be able to look at them and see some of this.

20          THE COURT:  Well, is that a reasonable

21  compromise, just get those documents?

22          MS. SILVERMAN:  These are the documents he's

23  saying are going to take two weeks.

24          THE COURT:  Is it going to take two weeks even

25  if you just have a very small handful?

1          MS. SILVERMAN:  See, I don't believe them.  I
2 think they can do it.  Even to pull up the data, print a
3 screen --
4          THE COURT:  What are my choices?  Should we
5 subpoena this woman and have her come in and talk to us, or
6 should we get the lawyer here on a nonevidentiary hearing?
7 What can we do?
8          MS. SILVERMAN:  If we could issue an order to
9 them to produce those documents within five days for the
10 patients he's offering to the jury.
11          THE COURT:  What jurisdiction do I have to
12 order them to do anything?
13          MS. SILVERMAN:  So there was a subpoena to
14 them, and they failed to comply with it.  So I think you
15 would have -- they have been properly served.  They could
16 be ordered to produce, pursuant to the subpoena, a narrowed
17 group of files identified as the files that the Government
18 is going to present to the jury.
19          THE COURT:  Well, do you want to submit such a
20 proposed order?
21          MS. SILVERMAN:  Yes, Your Honor, I would do
22 that.
23          THE COURT:  Mr. Balboni?
24          MR. BALBONI:  Yes, Your Honor.  Two things:
25 First of all the 17C subpoena is only -- I believe it's

1  returnable the day of trial, so they're not obligated to

2  produce until the 22nd, first of all; but secondly, again,

3  it's going to take -- my understanding from what I've been

4  told is they have to load all of it before they can begin

5  picking and choosing which claims.

6                 Now, for certain, it will reduce the

7  burden if they only have to print, what, the 15 or so

8  claims that Ms. Silverman is asking for; but just so we're

9  all on the same page, just because the Government picked --

10 I don't know if 15 is the right -- let's say it's 15 --

11 claims as substantive counts of healthcare fraud, the

12 Government fully intends on introducing all of the claims

13 in the conspiracy.

14                 So I don't know, having said that, if that

15 changes Ms. Silverman's idea of what it is she needs to

16 see, but let me just point out that this case has been

17 pending for quite a long time.  Ms. Silverman has been in

18 it since September of 2015.  We were supposed to go to

19 trial on December 1st of 2015, and it isn't until

20 January 19th, I believe it was, of 2016 that the subpoena

21 goes out for what turns out to be an onerous amount of

22 records.  So we would object to any continuance at this

23 point, again, Your Honor.

24                 MS. SILVERMAN:  And so I disagree with his

25 interpretation of 17C.  17C is there to help us to get

1  documents from nonparties, and the case law is pretty clear

2  that it can be to a hearing prior to or to another date

3  that would allow the documents to be used and prepared for

4  court.  So I disagree with that.  I think you can issue an

5  order that they must produce them within five days.

6               The issue of the number of -- well,

7  actually, no.  Let me address the issue of him suggesting

8  that we waited.

9               We've asked for these documents.  Dan

10  Cogdell asked for these documents.  Dan thought that he had

11  been given those documents when he was given a disk that I

12  then had to ask for another copy of.  When I saw that disk,

13  I had no way to know that that wasn't the original until I

14  showed it to my expert, who said, No, that's not the

15  claims; this is not helpful to me to review the case.

16               I immediately started contacting the

17  prosecutor to get them and did finally issue a subpoena

18  first to TrailBlazer, the company that was the company in

19  charge of these particular claims at the time.  They

20  subsequently went out of business, lost the contract, and

21  their parent company's lawyer explained to me that the

22  subpoena had to be to Novitas, the current company, which I

23  then did.  We have not in any way sat on our laurels.  We

24  have fought for this information from the beginning.

25               I'm not standing here asking for the

1  continuance.  I'm asking for the data.  And my expert will

2  get right on it when we have that data, which is needed in

3  advance of trial so that we'll be able to cross-examine the

4  witnesses, be able to be prepared to present our case in

5  trial.

6             We did have other discovery issues, too,

7  when we get through with them.

8             THE COURT:  Okay.  Well, you can just submit a

9  proposed order, which I will take under advisement.

10             MS. SILVERMAN:  Okay.

11             THE COURT:  What is your next motion you want

12  to take up?

13             MS. SILVERMAN:  So the other issues that are in

14  the discovery are getting unredacted copies of the

15  memorandums of interview.  The Government had shown us

16  copies that were redacted.

17             THE COURT:  The Government says it provided all

18  that on January 22nd.

19             MS. SILVERMAN:  Oh, no.  What they provided was

20  actually the phone numbers for the --

21             THE COURT:  All witness contact information,

22  yes.

23             MS. SILVERMAN:  For the witnesses, no.  The

24  actual data, the Memorandum of Interview, have information

25  about other places these witnesses may have gone, and we

1  believe those places are linked together.  That's actually

2  what Mr. Cogdell has been saying since the beginning, but

3  we have found some evidence since then in our investigation

4  that there's clinics that are linked to us and that we

5  believe that potentially, the billing is being handled in

6  one location in some fashion.  So it's important to us to

7  see the data from these other connected clinics.  And this

8  information will be in the MOI, the other clinics, but it

9  won't have the billing data.  I believe the Government has

10 the billing data from other cases it's prosecuting related

11 to this.

12              THE COURT:  Have you had this conversation with

13 Mr. Balboni?

14              MS. SILVERMAN:  Yes, we've asked for these

15 things.  He doesn't think they're related.  He is opposed

16 to this.

17              THE COURT:  This is very unusual to have this

18 much disagreement about discovery in a criminal proceeding.

19 It really is.  I don't know where the problem lies, but it

20 doesn't seem to me that the case is that out of the

21 ordinary, nor the evidentiary issues that out of the

22 ordinary.  What am I missing?

23              MS. SILVERMAN:  Well, I don't know why we're

24 not getting this information either.  And this was an issue

25 that Cogdell raised right from the beginning, that when I

1 | saw the file, I realized I had to look into it myself, and
2 | once I looked into it, I discovered the same connections
3 | that he feared were there actually are there.  There's
4 | another clinic that is seeing the same patients that we're
5 | sending, that our clinic apparently is sending them to,
6 | that's getting some of the treatment that then appears in
7 | our files.  And so they're connected.  I've been able to
8 | find the connection.
9 |             I don't know why they don't want to
10 | produce this to us.  If there is nothing in it that's
11 | damaging, just produce it so we can see it.  I mean, maybe
12 | it's not important to him.  Maybe he doesn't understand or
13 | see the importance to the Defense; but to us, it's
14 | important, and it's been important since the beginning.
15 | Our investigation has just found those links that Cogdell
16 | thought were there.
17 |             THE COURT:  Want to respond to that,
18 | Mr. Balboni?
19 |             MR. BALBONI:  Your Honor, we have been battling
20 | this concept, this defense that has been brought forth,
21 | that somehow all of the criminal activity in the greater
22 | Houston area during a certain time period involving
23 | diagnostic clinics are somehow interconnected; therefore,
24 | it's one grand conspiracy and all of these doctors have
25 | been duped by the Armenian individuals who are the managers

1 in some of these clinics.

2                    Yes, certainly the beneficiaries go from

3 clinic to clinic, but that's because they're being paid,

4 unfortunately, to go to the clinics, not necessarily

5 because this clinic, the Chenevert clinic, is sending them

6 to the ABC Clinic over here.

7                    Because of the way the investigation

8 played out when it was determined that Beneficiary A was

9 being billed out of, say -- just make it up -- five

10 different clinics, when the investigators went to talk to

11 the Beneficiary A, they asked questions about all five

12 clinics; so, therefore, the Memorandum of Interview details

13 their responses for all five clinics.  In other words, the

14 Memorandums of Interview were redacted so that only the

15 information they gave regarding this clinic was made

16 available to the Defendants in this case.

17                    If the Defense wants to argue that for

18 impeachment purposes to show that not only are they getting

19 paid to go to this clinic, but they were paid to go to six

20 other clinics, then the Government can provide a list of --

21 or the number of clinics that each beneficiary, as far as

22 the Government knows, went to; but as far as this theory

23 that they're somehow all linked together, that issue has

24 already been raised and debunked in the Barson case in

25 Judge Harmon's court and raised and debunked in the Nguyen

1  case in Judge Hughes's court.  And so --

2          THE COURT:  Are you saying it's somehow law of

3  the case now or --

4          MR. BALBONI:  No, Your Honor.  I don't mean to

5  say that, no, but I guess what I'm saying is that we're on

6  a fishing expedition at this point, this close to trial,

7  after this length of time.  If it's been raised since

8  Mr. Cogdell was in the case -- this case was first indicted

9  in May of 2014, which means we're coming up on the two-year

10 mark, with the first trial set in July of 2014.  We've had

11 since then -- one, two, three, four, five -- six settings.

12 The one coming up is our sixth trial setting since then.

13 We've had three trial settings since Ms. Silverman has been

14 in the case.

15          THE COURT:  Well, I do like to get the cases to

16 trial quickly.  I really do.  So this is an old case, by my

17 metric.  But I don't want to disadvantage anyone in terms

18 of what's needed to try the case the way they want to try

19 it.

20              I just don't see a Solomonic compromise

21 that I can impose on the parties.  How do I find my way out

22 of this?

23          MR. BALBONI:  Well, Your Honor, with respect to

24 the redacted MOIs, first, we don't have contact

25 information.  We can't contact these witnesses.

1           THE COURT:  That's what I thought the issue

2  was.

3           MR. BALBONI:  Right, and the Government

4  provided that information to them.  Now it's we need to

5  know what else they said about what other clinics, because

6  Ms. Silverman is representing that she has found now

7  evidence of these connections that Mr. Cogdell had just

8  thrown out there.

9               Again, if it's a matter of which clinics

10 did they go to and were they paid, we can give that to them

11 in summary form.  That's a compromise.  It's the

12 Government's position that just providing the MOIs, making

13 them available, is a compromise since they're not

14 statements of the witnesses; and so, therefore, they're

15 really not discoverable.  The Defense is not entitled to

16 them.  So we've already come a ways towards the center by

17 just allowing them to read all of these MOIs, and now they

18 want to read parts of the MOI that it's the Government's

19 position is not part of this case.

20          MS. SILVERMAN:  If I could respond.  Mr. Berg,

21 who is in the Nguyen case, advises that that case has not

22 been to trial, and so nothing has been debunked or anything

23 in that case.  The issues will still be, I'm sure,

24 presented there.

25               What I'm talking about, too -- and the

1  MOIs might have some enlightenment, and it's not even the
2  most disconcerting thing.  I'm trying to get to the
3  billing.  I'm trying to get to the bottom line of where
4  this billing is accomplished, because you're going to hear
5  in trial that we had nothing to do with the billing.  And I
6  believe that the -- and I am prepared to narrow this to the
7  clinics that are run by these same people.  That's what
8  I've said in the motion.  The clinics that are run by this
9  same family, not all Armenian criminals, not the entire
10 Armenian mafia.  I understand that's what Cogdell was
11 saying.  But there is at least the Almeda clinic that is
12 run by the same people.  I've confirmed that with more than
13 one witness.
14                    And when I say that our beneficiaries were
15 sent from our clinic, I'm talking about the times when
16 actually the physicians assistants in our clinics said, You
17 need this test.  I believe that, based on what you're
18 telling me, and you have to go to this other place to get
19 it because we can't do it.  I'm not talking about when --
20                    THE COURT:  How does that help your case?
21                    MS. SILVERMAN:  Because I'm trying to get to
22 the bottom of the billing, and I think that the billing
23 from those clinics was done at the same place.  I think
24 that that is where I may be able to get to the bottom of
25 how this billing was being done and where the fraud was

1  occurring.  And I feel like I'm -- I mean, I know I don't

2  have any burden, but that's what we're trying to do.  We're

3  trying to prove where the fraud occurred, because we didn't

4  have anything to do with it.

5              And what we have, we have, the patient

6  files.  We saved our originals.  Dr. Kibert himself, when

7  he closed the clinic and the files were originally taken by

8  the Armenian family and placed in a warehouse, he got

9  access to the warehouse, took the files, and he gave those

10 files to the Government.  He met his obligation to keep the

11 originals.  Those originals have the superbills in them.

12 The superbills indicate that what the PAs checked off as

13 the diagnosis and the tests that are expected.  What is on

14 the Medicare data on these spreadsheets that they're

15 producing is more than that; and so that's why it's so

16 important to me to get to the bottom of where this billing

17 actually occurred.  And if I can get to the other clinic,

18 there's other witnesses to interview who may know something

19 more.  We've interviewed all the employees of our clinic

20 that they've given us the contact information for.  We've

21 exhausted them, and we've gotten some information that was

22 helpful, but I believe that the other clinic may be able to

23 give us the same information, additional information, and

24 get to the bottom of it.

25              THE COURT:  Okay.  A short recess.  Nobody need

1   rise.

2              (Break taken from 12:03 to 12:13.)

3              THE COURT:  Okay.  I have also received a

4   Motion to Sever, and let's talk about that next.

5              MS. SILVERMAN:  Yes, Your Honor.  On the Motion

6   to Sever, you know, initially, when I got in on the case,

7   the intent of the lawyers had been that this was a joint

8   defense, and that seemed to make sense to me when I first

9   saw the file.  There was an indication in Mr. Cogdell's

10  file that the billing was being sent to California.  I

11  could see in the summary of the bank records from the

12  Government that $16,000 was sent to a billing company in

13  California, so it appeared that there was a joint defense,

14  that everyone was going to blame California, that's not

15  here.

16              I have looked into that, looked closely at

17  the bank records, and seen that despite the fact that the

18  summary has given this information to us as part of our

19  case, the bank records show it after the time period of the

20  charge, which Mr. Balboni --

21              THE COURT:  Slow down a little bit.

22              MS. SILVERMAN:  Okay.  And we've interviewed

23  the employees in California.  My investigator in California

24  has interviewed them, and they don't have records from this

25  case.

1          And so the end result is, you know, it's
2 got to be somebody in the clinic, which means it's got to
3 be one of the Defendants, more than likely, who is doing
4 the billing, which caused the crossover, antagonistical
5 defenses.  And I had been able to speak to Mr. McCann about
6 that and his client's California lawyer, and they agreed
7 with me -- I'm sure if he's still there, he'll be able to
8 chime in and say they agree that their client would be
9 saying the opposite, that if we're saying that his client
10 had to be the one that was doing the billing, he's going to
11 be saying, No, it wasn't us; it had to be you.  And the
12 billing is the actual core of the case.  And so, you know,
13 the --
14          THE COURT:  Hasn't the Government offered to
15 stipulate to this, though?
16          MS. SILVERMAN:  What the Government has offered
17 to stipulate to is that Dr. Kibert did not enter the claim
18 form into the computer.  And we certainly appreciate that
19 stipulation and will be glad to accept that in front of the
20 jury.  That doesn't answer the question, though.
21          We're saying that it's different than
22 being in charge of the billing or being responsible for it
23 or directing somebody to do the billing.  They're willing
24 to say we didn't direct anybody, that would certainly be
25 helpful.  But also, the Medicare documents, because they

1 don't match, that plays back into this same issue.  They're

2 saying we didn't do the billing.  We're saying the billing

3 is fraudulent.  The billing that was done was wrong.  And

4 so someone that did the billing in our office, we're going

5 to be saying has committed fraud.

6           THE COURT:  Okay.  Let me hear from

7 Mr. Balboni.

8           MR. BALBONI:  The Government is willing to

9 stipulate that Dr. Kibert did not physically file the claim

10 because it seems to -- without knowing the Defense's

11 complete strategy, that that is one of the things that

12 we're very interested in proving or disproving, however you

13 want to look at it, and that is that Dr. Kibert didn't have

14 anything to do with the billing.

15           It's the Government's position and it's

16 the law that it doesn't matter who physically keys in the

17 claim.  It is who is responsible for the person who --

18           THE COURT:  So you're saying that he ordered

19 unnecessary tests and procedures and with the understanding

20 that someone would key those in and turn them into claims?

21           MR. BALBONI:  No, sir.  The facts seemed to

22 indicate that Dr. Kibert did very little at the clinic.  He

23 was supposed to be supervising licensed physician

24 assistants.  Of the two physician assistants alleged to be

25 working there during the time period charged, only one of

1  them was actually a licensed physician assistant, so that

2  with the -- for anything done by Defendant Christopher

3  Brown, it is, in and of itself, fraudulent, because he had

4  no authority to diagnose medical.

5          MR. ADLER:  I think you used the wrong name.

6  You said Chris Brown.

7          MR. BALBONI:  Oh, I'm sorry.  Mr. O'Brien,

8  Christopher O'Brien, not the lawyer.  Mr. O'Brien is or

9  was, at least at the time, a licensed PA.

10          But Dr. Kibert was supposed to be

11  supervising, under the rules of the Texas Medical Board,

12  these two physician assistants.  He didn't register as

13  supervising either one of them.  He couldn't supervise or

14  register as supervising Mr. O'Brien because Mr. O'Brien was

15  not a licensed physician's assistant himself.  And so the

16  theory of the case is that from the beginning, Dr. Kibert

17  engaged in a series of events that were -- that lead up to,

18  essentially, the fraudulent billing.

19          He is the one who filed for the Medicare

20  application.  He's the one who certified that it was his

21  clinic, to Medicare.  He's the one that certified he knew

22  all the rules; he would follow all the rules.  And it was

23  based upon that certification that Medicare issued the

24  provider number for Dr. Kibert's clinic on Chenevert.

25  Without such provider number, none of this fraud could have

1 occurred.

2                    The next step was that Dr. Kibert opened

3 up a bank account in his name to receive all of the funds

4 that would be deposited from Medicare, based on all the

5 claims coming under his provider number from that clinic.

6                    He then turned, essentially, control over

7 that account over to the people who were, if you will,

8 managing the clinic.  He either wrote and signed checks as

9 they directed him to, or I believe in some instances he

10 just signed blank checks so that they could just fill in

11 the payee as they needed to be.

12                    And so Dr. Kibert had complete control

13 over the formation of the clinic, the operation of the

14 clinic, the filing of the claims, because he certified,

15 again, on that application that he would not file false

16 claims.  He also, in that same application, indicated that

17 the billing would be done in-house.  It would not be

18 contracted out, if you will, to a third-party biller.

19                    There is a safeguard with Medicare where

20 every time they deposit money into Dr. Kibert's account,

21 they send Dr. Kibert what's called a Remittance Notice that

22 details all of the claims that were either paid or denied

23 with all of the codes indicating what type of services or

24 procedures were done.  That is sent to Dr. Kibert so that

25 there's a check and balance as to -- so he knows which --

1  what claims have been filed, what claims have been paid,

2  which ones have been denied.

3            THE COURT:  Okay.  I got you.  Thank you.

4                 Ms. Silverman?

5            MS. SILVERMAN:  I think you can see why just

6  stipulating that we didn't key in the data doesn't solve

7  this problem.  The issue here is the responsibility for the

8  billing, and we're saying that we had nothing to do with

9  the fraudulent billing.  In fact, we're saying it was done

10 without our authority.  And so we need to be able to get to

11 the bottom of who was doing this so that we can investigate

12 how this happened, where this additional authority came

13 from.  And it may be the person keying it in, or it may be

14 someone telling the person to key in this additional data.

15 I'm not sure if it's happening at the clinic or if it's

16 happening, as I said earlier, at a location combining

17 several clinics into one criminal who is filing these

18 fraudulent claims, adding to them so that Dr. Kibert saw

19 and approved a document that's called the superbill.  That

20 went to somebody, and that's the person who we believe is

21 acting without authority and committing the fraud.  And

22 that's the information we're trying to get at, and it

23 creates this antagonistical defense on the core issue of

24 the case, that is billing in Medicare.

25            THE COURT:  Okay.  Is there anything else we

1   need to turn to today?

2             MR. BALBONI:  Just before I forget again, as I

3   did the last time we were all together, United States has

4   had filed since July a Motion for Reciprocal Discovery, and

5   we have not received any reciprocal discovery, and so I

6   would ask that the Court would order the defense do --

7             THE COURT:  Attorneys this experienced and this

8   good would know their obligations.  I assume you don't have

9   any.

10            MS. SILVERMAN:  Actually, we've turned some

11  over.  So if you didn't get it, we actually sent an e-mail

12  with a pile of documents that we planned out and labeled

13  them as exhibits.  If you didn't get it, then we have an

14  e-mail exchange.  It came last week.

15            MR. BALBONI:  Last week.

16                 That may be, Your Honor.  I haven't seen

17  it, but we can work that out.  That's not an issue.

18            MS. SILVERMAN:  Yeah.  We sent them everything

19  we had.

20            MR. ADLER:  Judge, I sent an e-mail, and it may

21  have gotten lost in the shuffle.  I know the Government is

22  juggling a lots of balls here.  But I sent an e-mail to the

23  Government saying that I had Mr. Brown's military records,

24  certified copy, but they were in sort of this formal seal

25  that I was hesitant to break.  And I said if you want to

1  see it, just let me know.  So that's the only discovery

2  that I have at this point also.

3              THE COURT:  Okay.  I'm going to have to deny

4  the Motion to Sever.  As I understand the governing law,

5  this is not a case where severance is required.  I also

6  think it's very late to be asking for severance.

7                   As to the issue of my ordering a

8  third-party to produce documents or produce any other

9  responsive materials, I will look for the proposed order,

10 but I have grave doubts as to whether I can do that.

11                   The question of billing records from other

12 entities is one that I wasn't prepared to discuss today.  I

13 did not see it in the written materials until -- well,

14 anyway -- and based on what I know right now, I'm not going

15 to be able to order that kind of discovery.

16                   Now, maybe I've missed something, and you

17 can file supplemental writings, but I wasn't prepared to

18 discuss that.  I don't think it was timely requested, and

19 I'm unable to afford relief on that basis.

20                   Is there anything else, sir?

21              MR. ADLER:  I do have a few items I can go

22 through quickly, Judge.

23              THE COURT:  All right.

24              MR. MCCANN:  No, sir.

25              THE COURT:  Mr. Adler has a few things to talk

1  about.

2          MR. ADLER:  Thank you, Judge.  Just to let the

3  Court know, I have subpoenaed some records from the Texas

4  Medical Board as far as back as July, resubpoenaed them in

5  September.  I literally just called the medical board again

6  as you were taking the recess.  I don't know what the

7  problem is, but I want to at least be able to say to them

8  that I raised it with the Court and that I'm trying to get

9  them to turn over the records before trial.

10         THE COURT:  You get no response, or just

11  opposition?

12         MR. ADLER:  It's not been a responsive at all.

13  I don't think they're going to be opposed.  I just think it

14  keeps getting lost up there.  But I want to be able to say

15  to them that I at least raised it with Court to light a

16  fire under them.

17         THE COURT:  You can say exactly that with a

18  clear conscience.

19         MR. ADLER:  Okay.  I've asked the Government if

20  they're going to bring the witness statements, the reports

21  drafted by the agents in this case, to the courtroom.

22  Although they've made them available to us many times, we

23  don't have the physical copies of those documents.  I think

24  the rules allow for me to refresh a witness's recollection

25  with any kind of writing, whether it's a Jencks Act

 1  statement of their own or not.  So I've asked the

 2  Government if they would be willing to bring those reports.

 3  And I --

 4            MR. BALBONI:  Your Honor, we will have them

 5  present in the courtroom subject to perhaps legal arguments

 6  that they're not entitled to use them, but we will

 7  certainly have them present.

 8            THE COURT:  These are Jencks Act statements

 9  that may be used to refresh?

10            MR. ADLER:  I don't think they're Jencks Act.

11  These are the statements drafted by the agent after they

12  interviewed the witness, but I think, as far as refreshing

13  the witness's recollection, the rules and the case law says

14  I can use any document at all.

15            THE COURT:  All right.  We'll take a look at

16  that.

17            MR. ADLER:  Okay.

18            From looking at the Government's exhibit

19  list and the exhibits, my client worked at the clinic

20  that's sort of at the heart of this case for about three

21  months, Your Honor.  And then we have -- outside of that

22  three-month period, we have the larger period of the

23  conspiracy that's been alleged.  I am going to make, at

24  this point, an oral Motion in Limine that the Government

25  not produce or not try to introduce any records of his

1  banking activity outside of the three months that he worked
2  at the clinic.  I don't see how any of that could be
3  relevant if he's not employed.
4              THE COURT:  Have you discussed this with the
5  Government?
6              MR. ADLER:  I have not.
7              MR. BALBONI:  We'll certainly take a look at
8  it, Your Honor.
9              MR. ADLER:  Okay.  And then, just some
10 logistical questions, Judge.  I don't remember how much
11 time you're going to give us for voir dire.
12             THE COURT:  How much do you want?
13             MR. ADLER:  Anybody have any --
14             MS. SILVERMAN:  I think that the last hearing
15 that was transcribed was something like 10 or 15 minutes
16 apiece that you gave to the Defense.
17             THE COURT:  That doesn't sound like me.  10 to
18 15 minutes apiece?
19             MS. SILVERMAN:  Apiece.
20             MR. BALBONI:  According --
21             THE COURT:  That doesn't sound right.
22             MS. SILVERMAN:  I --
23             MR. BALBONI:  According to the minute entry,
24 Judge, from November 23rd, the Court is going to allow one
25 hour for each side on voir dire, and then there was a

1 | mistake because it said 20 minutes each.  Of course,
2 | there's four Defendants, so it would have to be either 15
3 | minutes or --
4 |             THE COURT:  Okay.  I will make it an hour and
5 | 20 minutes.
6 |             MR. BALBONI:  So hour and 20.  In the opening
7 | statements, you said you allowed 40 minutes each side --
8 |             THE COURT:  Yeah.
9 |             MR. BALBONI:  -- ten per Defendant.
10 |             THE COURT:  Okay.
11 |             MR. ADLER:  And Judge, do you do any voir dire
12 | at all, or will it be --
13 |             THE COURT:  I do none of the voir dire.  I do
14 | none of the voir dire, no, no, unless you want me to
15 | because there's a sensitive question about criminal history
16 | or sexual history or drug use or --
17 |             MR. ADLER:  Okay.  If there is --
18 |             THE COURT:  I don't know why judges do their
19 | own voir dire.  I've never understood that.
20 |             MR. ADLER:  As far as the schedule
21 | day-to-day --
22 |             THE COURT:  The first day, we'll get started as
23 | soon as the jury is ready, but that probably won't be
24 | before 9:30.  We'll wait on the jury.  And I'll start with
25 | a homily about jury service.  Then we'll turn directly to

1  voir dire.

2              We will go, probably, that first day,

3  until 4:00 or 4:30, not later.  Thereafter, I'll let the

4  jury choose their schedule, because they're generally

5  dependent upon public transportation, so -- and generally,

6  they choose a very early hour, earlier than I would choose.

7  They often want to start at 7:30.  If we start at 7:30,

8  then we will work eight hours or so and knock off at 4:00,

9  4:30, something like that.

10             We normally take a break every

11 hour-and-a-half for the court reporter, if for nobody else.

12 And we take 45 minutes or an hour at lunch.  I'm not too

13 strict about any of these times.  If you-all need more

14 time, let me know.

15             MR. ADLER:  The day of --

16             THE COURT:  These have worked in the past.

17             MR. ADLER:  The day that we are going to do

18 voir dire, is there a time that we can come down, maybe

19 meet with the case manager to get the questionnaires prior

20 to the jury, the panel, actually coming in, or is --

21             THE COURT:  Let me have you discuss that with

22 Mrs. Loewe.  I don't know the answer to that.  You mean the

23 answers, the form they fill out that morning?

24             MR. ADLER:  Right.  Yeah.

25             THE COURT:  I'll have you discuss that with

1  her.

2              MR. ADLER:  Okay.  And then just to remind the

3  Court, I have a conference to go to as CJA panel rep on

4  March 3rd and 4th.  I think it's a Thursday and Friday.  So

5  I'm hoping that we can pause the trial.  I know that's an

6  inconvenience for the Court, the jurors, and the lawyers in

7  the case, but it's a once-a-year event and --

8              THE COURT:  Yeah, I know about that conference.

9  What day do we start?

10             MR. ADLER:  The 22nd of February.  And there's

11  a chance we'll be done, I suppose.

12             THE COURT:  I think that's fine.

13             MR. ADLER:  Hypothetically speaking, Judge, I

14  may have filed an ex parte motion to get the exhibits

15  printed up, because I'm court appointed, and it would be

16  helpful if the Court would authorize that.  I'm willing to

17  share it with the other counsel.

18             THE COURT:  As long as expenses are not

19  extravagant, I'm happy to authorize that.

20             MR. ADLER:  Okay.  And then lastly, I would ask

21  the Court and the Government if the Government would be

22  willing to disclose to us the following day's witnesses so

23  we don't have to sort of prepare for --

24             THE COURT:  I think that's good form.  I hope

25  the Government will do that.

1          MR. BALBONI:  Yes, Your Honor, we certainly
2  would, obviously, with the understanding that sometimes,
3  especially if I'm in the beneficiary witnesses, that we're
4  anticipating them being here and we can't find them or they
5  have a hospital or unexpected emergency-room visit -- with
6  that understanding, we'll certainly give Defense our best
7  estimate of who the witnesses will be for the following
8  day.
9          THE COURT:  I just authorized the expenditure
10  you asked about.  If it's going to be more than $1500, let
11  me know.
12          MR. ADLER:  Oh, no, no.  It's a couple hundred
13  dollars.
14          THE COURT:  That's fine.
15          MR. ADLER:  That's all I have, Judge.
16          THE COURT:  Anybody else?
17          MR. BALBONI:  Just --
18          MR. BERG:  My turn.
19          MR. BALBONI:  I'm sorry.  I didn't know you
20  were participating.
21          MR. BERG:  Just to clarify, we'll go Monday
22  through Friday until we're done?
23          THE COURT:  We normally knock off -- we don't
24  do Friday.  Since we're taking the Thursday and a Friday
25  off, normally, we don't do Friday because that's when I do

1  all my other hearings.

2          MR. BERG:  So we're looking Monday through

3  Thursday starting the 22nd?

4          THE COURT:  Is that right, Steph?

5          MS. LOEWE:  We haven't talked about it.

6          THE COURT:  I mean, I think that's what we'll

7  do.  Do you have a strong feeling you don't want to do that

8  or --

9          MR. BERG:  No.  I'm good with that.  I've got

10 to get some CLE before my birthday, and I tentatively set

11 it for that Friday, so it would be good to know.

12         THE COURT:  We, frankly, haven't talked about

13 it.  If you would like some time off that Friday, okay,

14 we'll factor that in.

15         MR. BERG:  Very well.  That's all I have.

16         THE COURT:  Okay.  Thank you.  Look forward to

17 working with all of you.  Thank you very much.

18         MR. BALBONI:  Judge, just one more.  I'm sorry.

19         THE COURT:  One more thing.

20         MR. BALBONI:  Because it's still pending, I

21 believe, the Motion in Limine from Defendant Kibert to

22 prevent us from introducing essentially the billing data,

23 the claims data that came from the clinic, that, obviously,

24 is going to have to be resolved.

25         THE COURT:  No.  I'm going to deny that.

1          MR. BALBONI:  Thank you, Your Honor.

2          THE COURT:  Thank you very much.

3       (Concluded at 12:32 p.m.)

4

5              COURT REPORTER'S CERTIFICATE

6

7    I, Kathleen K. Miller, certify that the foregoing is a

8  correct transcript from the record of proceedings in the

9  above-entitled matter.

10

11                    /s/_____

                      Kathleen K. Miller, RPR, RMR, CRR
12

13

14

15

16

17

18

19

20

21

22

23

24

25